WES. BARNETT v. THE STATE.

No. 2204.   Decided November 28, 1900.

*Motion for Rehearing Decided February 13, 1901.*

1. **Assault with Intent to Commit Rape—Resistance by Prosecutrix—Charge of Court.**

On a trial for assault with intent to commit rape, resistance by force on the part of the prosecutrix to the utmost of her efforts to prevent defendant from accomplishing his purpose, is a criterion by which consent vel non on her part is to be tested; for, if there is no such resistance to the attempted carnal act used by her, the presumption obtains that she consented; and, ordinarily, it is the duty of the court to so charge the jury.

2. **Same—Omission in Charge—Injury to Defendant.**

On a trial for assault with intent to commit rape, where the court omitted or failed to charge, in terms, that the jury must believe that the prosecutrix put forth her uttermost efforts to prevent defendant from accomplishing his purpose; Held, the omission did not constitute reversible error since it did not injure the rights of defendant (Code of Criminal Procedure, article 723), it appearing from the evidence that prosecutrix did resist the efforts of defendant successfully, and that there was no lack of resistance, or evidence tending in the slightest to show consent on her part. Davidson, P. J., dissenting.

**3. Charge of Court—Article 723, Code of Criminal Procedure, as to Practice on Appeal—Constitutional Law.**

Article 723, Code of Criminal Procedure, providing that a conviction shall not be reversed on appeal for errors of omission or commission in the charge of the court where exceptions as to the same were not reserved at the trial, etc., unless such errors were calculated to injure the rights of the defendant is not unconstitutional, nor an effort on the part of the Legislature to interpret the law, but it is to be construed as modifying "the eight preceding articles" of the Code to which it refers. Davidson, P. J., dissenting.

**4. Same.**

Article 723, Code of Criminal Procedure, is, in all respects, constitutional, since it provides a complete, reasonable, and adequate remedy for the assertion of an appellant's rights, under the Constitution, if availed of at the time of the trial.

APPEAL from the District Court of Williamson. Tried below before Hon. R. E. BROOKS.

Appeal from a conviction of assault with intent to commit rape; penalty, five years imprisonment in the penitentiary.

The opinion states the essential facts in the case.

*Fisher & Fisher* and *J. F. Taulbee,* for appellant. [See their brief in full in the dissenting opinion of Presiding Judge DAVIDSON.—Reporter.]

*Rob't A. John,* Assistant Attorney-General, for the State. [No brief for the State found with the record.—Reporter.]

BROOKS, JUDGE.—Appellant was indicted and convicted of an assault with intent to rape, and his punishment assessed at five years confinement in the penitentiary.

Prosecutrix testified, in substance, that on December 29, 1899, she started with appellant from a party to her home. They left the party about midnight. Appellant drove rapidly for about half a mile south; then turned west on the road leading by Joe Queen's house. Appellant said, "I believe I will halloo." She insisted he should not. "He then asked me to kiss him. I told him I would not do it; that I was not that kind of a girl." "Appellant had slowed up the team just before he got in the road that runs east by Salyer schoolhouse and west by Joe Queen's house, there being a wagon in front of us. The wagon turned east, and we turned west. Some one approached us in a buggy, and defendant said: 'I wonder what those people want with us. I suppose they want you.' I replied I guessed they did not want me. The buggy then passed us, and went on out of hearing. Defendant asked me to take the lines and drive, as he wanted to put on his gloves. After putting on his gloves, he again took the lines. He then asked me if I loved him. I told him I loved everybody. He asked me to 'let him have a piece.' I told him he ought to be ashamed of himself. I was sitting on his left side. He stopped the horse, threw his right arm around me in front,

caught me by the left side with his right hand. He got in front of me between my feet, and pushed my left foot out of the buggy, holding me at the same time pressed against the back of the buggy seat. He pressed his breast against me, and got down on his knees, and ran his left hand up under my clothes, and put his bare hand on my privates. He caught my right leg with his left hand. His pants in front were unbuttoned, but I do not know whether his penis was out of his pants or not. He unbuttoned my drawers, which were buttoned on my right side, and pulled them down in front. He had his right hand around my waist, and had my right leg with his left hand, and was holding me so that I could hardly move. I caught hold of his hands, and tried to hold them, and pushed against his breast with my hands with all my strength. I begged him to quit, and let me alone, and tried to shame him. He said I had just as well give up, as he was going to take it anyway. He used great force, and handled me so roughly as to hurt me. While he had me in the position I have described, he raised my clothes, and pulled my body towards him, and pushed his body towards me. I resisted him with all my strength, and in every way I could, from the time he first took hold of me. During the struggle, I pushed him back against the dashboard of the buggy, and got loose from him, and jumped out of the buggy. When I jumped out of the buggy, I hallooed twice. I cried 'Oh! Oh!' twice. I then ran up the road about fifty yards. Defendant called to me, and I understood him to say that I had just as well come back, as he would catch me before I got home. I heard defendant's buggy start rapidly, the wheels rattling as if going fast. It was dark, and I crawled under a barbed wire fence, and went a mile through a thick brush pasture, most of the way without any road, except the last quarter, until I reached by Uncle Zack's house, and I stopped there, and immediately told my aunt what had happened, and who had done it. My uncle then went home with me, and I told my mother what had occurred. He did not tear my drawers, but simply unbuttoned them." The above is, in substance, the testimony adduced upon the trial.

Appellant insists that the court's charge is erroneous in the following portion: "You are instructed that, in order to constitute the offense of an assault with intent to rape, it must be shown by the evidence, beyond a reasonable doubt, that the defendant made an assault upon the person of the witness Beulah Walker as alleged, and that at the time of such assault, if any, the defendant had the specific intent to have carnal knowledge of the said Beulah Walker by force, and without her consent, and that he intended to use such force, if necessary, as would be sufficient to overcome such resistance on the part of Beulah Walker as she should make." He insists that the charge should have gone further, and stated that the jury must believe from the evidence, beyond a reasonable doubt, that the prosecutrix put forth her utmost efforts to prevent appellant accomplishing his purpose, considering the relative size and strength of the parties, the conditions surrounding them at the

time, and other circumstances of the case. In this appellant is sustained by the case of Mooney v. State, 29 Texas Criminal Appeals, 257. We there held that force on the part of the prosecutrix in resisting to the utmost the effort on the part of appellant to accomplish the offense is a criterion by which the consent is to be tested; for, if no resistance to the carnal act is made by the prosecutrix, the presumption obtains that she consented to the act. The same view is expressed by us in Owens v. State, 39 Texas Criminal Reports, 391. However, article 723, Code of Criminal Procedure, provides, in substance, that we shall not reverse a case unless the error complained of was calculated to injure the rights of appellant. Was this calculated so to do? We think not; since the undisputed evidence shows that the prosecutrix resisted the efforts of appellant successfully, and finally fled from his presence, in the nighttime, to the house of a relative. If there had been any evidence indicating consent on her part, or a lack, rather, of resistance, then a charge of the character insisted upon by appellant's counsel would have become necessary, and its absence would probably have injured the rights of appellant. But here the prosecutrix has used all the force necessary, since that used by her accomplished all that she sought, i. e., escape from the lascivious embraces of appellant.

The learned judge, among other things, charged the jury as follows: "The definition of force, as applicable to an assault and battery, applies also to the crime of rape; and, in order to constitute rape, the force must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances of the case. * * * Now, if you believe from the evidence in this case that the defendant assaulted the said Beulah Walker, as alleged in the indictment, but you have a reasonable doubt whether, at the time of such assault, he intended to have carnal knowledge of the said Beulah Walker without her consent, or have a reasonable doubt whether he intended, if it became necessary, to force compliance with his desires at all events, regardless of any resistance that might be made by said Beulah Walker, then you will find the defendant not guilty of an assault with intent to rape. Unless you believe from the evidence, beyond a reasonable doubt, that the defendant assaulted the said Beulah Walker as alleged, and that at the time of such assault, if any, the defendant intended to have carnal knowledge of her without her consent, and by force, and that he intended, if necessary, to use such degree of force as would be reasonably necessary to overcome any resistance on the part of said Beulah Walker as she could make, taking into consideration the relative strength of the parties and other circumstances of the case, you will acquit the defendant of an assault with intent to rape. If you believe from the evidence the defendant assaulted the said Beulah Walker as alleged, and that he used force to accomplish his purpose, but have a reasonable doubt whether or not he

intended thereby to force compliance with his purpose in spite of any resistance on her part, or whether he merely intended thereby to obtain the consent of said Beulah Walker to such intercourse, then you will acquit the defendant of the charge of an assault with intent to rape." In the opinion of the writer, were it an original question, I would hold that these excerpts, taken in connection with the entire charge, would constitute a correct charge on the law; but the whole trend of the decisions is against this position. They hold that there must not only be the specific intent on the part of the appellant to accomplish the purpose, but that there must be such resistance on the part of the prosecutrix as shows the utmost effort on her part to resist the assault, taking in consideration the relative strength and size of the parties and the surrounding circumstances. We therefore hold that the contention so ably insisted upon by appellant in his brief as error is well taken; but in the light of the record before us, as indicated, it is not such error as is calculated to injure the rights of appellant, since there is no question in this case that prosecutrix used all the force necessary to defeat the appellant's purpose in the assault committed upon her.

Appellant also insists that the evidence is not sufficient. After a very careful review of the facts, we believe they support the verdict of the jury. The jury have passed upon the sufficiency thereof, and we see no reason for disturbing their finding. The judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

#### February 13, 1901.

BROOKS, Judge.—The judgment herein was affirmed at the Tyler term, 1900, and now comes before us on motion for rehearing. The main insistence of appellant is that article 723, Code of Criminal Procedure, is unconstitutional. We have frequently passed upon this matter, and have uniformly upheld its constitutionality. Johnson v. State, *ante*, p. 87. But, on account of the very able and ingenious argument of appellant's counsel, we deem the subject of sufficient importance, in deference to said argument, to review the matter again. Prior to the amendment, article 723 (which was then article 685 of the old Code) read: "Whenever it appears by the record in any criminal action upon the appeal of a defendant that any of the requirements of the eight preceding articles have been disregarded, the judgment shall be reversed, provided the error is excepted to at the time of the trial." Under the provisions of this article we had held that, however immaterial the error may have been, if promptly excepted to, and presented by proper bill of exceptions on appeal, the statute was mandatory, and the conviction should be set aside, without inquiry as to the effect of such error in prejudicing defendant's right before the jury. This construction of the

article extends as far back in our jurisdiction as Marshall v. State, 40 Texas, 200; and that construction was maintained up to the adoption of the present article 723, which was an amendment of the above quoted article. The uniform trend of authorities under the old article was that the statute made it obligatory upon this court to reverse the judgment, and the reversal was placed upon the sheer force of the statute alone. Now, we base the present ruling upon article 723 and the sheer force of the statute alone. Appellant insists that the Legislature can not interpret a law, and makes a long, elaborate, and ingenious argument to establish this. It is axiomatic the Legislature can not interpret a law, but they can pass a statute to be interpreted by this court. They did pass such a statute (article 685 of the old Code), and they amended that article by the enactment of article 723 of the present Criminal Code. Now, then, when so amended, article 723 must be construed as an integral portion, part, and parcel of the whole Code of Criminal Procedure, and especially as part and parcel of the "eight preceding articles" in the Code of Criminal Procedure. When so construed, we think the only rational, legal, and authorized construction of said articles is: Whenever it appears by the record in any criminal action, upon the appeal of a defendant, that any of the requirements of the eight preceding articles have been disregarded, the judgment shall not be reversed, unless the error appearing from the record was calculated to injure the rights of the defendant, which error shall be excepted to at the time of the trial or on motion for new trial. Now, then, if the judge fails to give a charge in writing applicable to the facts of the case as required by one of the "eight preceding articles," this fact must be excepted to at the time of the trial or on motion for new trial, else we can not review it. This is the clear, reasonable, and rational construction of the article. Article 723 is not a legislative effort to construe the preceding articles, but it is a constitutional amendment of the old article, and, as stated, becomes an integral portion of the Code of Criminal Procedure, and must be construed with reference to it. It is conceded by this court, if the Legislature were to pass a resolution, as insisted upon by appellant, construing any provisions of the Code, their construction of the Code would not bind this court, because it would be a usurpation of judicial power on the part of the Legislature. The three co-ordinate branches of our government must and shall be kept inviolate as long as our form of government exists. But if the Legislature pass a statute modifying the meaning, purpose, and intention of a previous statute, then the last enacted statute must be taken as modifying the previous statute, and to that extent a repeal of the previous statute, so to speak; otherwise, the Legislature could never change a law.

Defendant has no vested right in a remedy or a statute providing a remedy. The eight articles that precede article 723, Code of Criminal Procedure, have no more sanctity than any other article in the Code of Criminal Procedure. They are statutes passed by the Legislature in

furtherance of their duty to provide a Code of Criminal Procedure, and so far as they provide a reasonable, adequate, and constitutional remedy for the assertion of legal and constitutional rights, just so long is the statute constitutional. On this subject the rule is tersely stated by Potter, Dwar. St., page 472: "Whatever belongs merely to the remedy may be altered according to the will of the State, always provided the alteration does not impair the obligation of the contract; but, if a statute so changes the nature and extent of an existing remedy as materially to impair the rights and interests of the owner of property, it is just as much a violation of the constitutional provision as if it directly overturned the rights and interests. If the remedy does not impair the right of property itself, if it still leaves the party a substantial remedy according to the course of justice, as the right existed at the time of the passage of the statute, it does not impair the obligation of the contract, nor will it be held to do so merely because the new remedy is less efficient, less speedy, or less convenient than the old one." And again, where the Legislature "provided a new remedy in the cases where the right of re-entry was reserved to enforce the collection of the debt due the landlord, it was held this was an ordinary and proper exercise of legislative power, unless individuals by contract can perpetuate a legal remedy in spite of the Legislature, which is absurd." The State "is bound to afford adequate process for the enforcement of rights, but it has not tied its own hands as to the modes by which it will administer justice. Those, from necessity, belong to the supreme power to prescribe, and their continuance is not the subject of contract between private parties." See Id., p. 473. The same thought is expressed by Black on Interpretation Law, page 265, as follows: "No person has a vested right in any form of procedure. He has only the right of prosecution or defense in the manner prescribed for the time being, and, if this mode of procedure is altered by statute, he has no other right than to proceed according to the altered mode. Indeed, the rule seems to be that statutes pertaining to the remedy or course and form of procedure but which do not destroy all remedy for the enforcement of the right, are retrospective, so as to apply to causes of action subsisting at the date of their passage. Statutes which relate to the mode of procedure, and affect only the remedy and do not impair the obligations of contracts or vested rights, are void; and it is no objection to them that they are retroactive in their operation. It is competent for the Legislature at any time to change the remedy or mode of procedure for enforcing or protecting rights, provided such enactments do not impair the obligations of contracts, or disturb their vested rights; and such remedial statutes take up proceedings in pending causes where they find them; and, when the statute under which such proceedings were commenced is amended, the subsequent proceedings must be regulated by the amendatory act." Now, reverting to the statute under discussion, we find that the Legislature has provided that, if a defendant

does not except by bill of exceptions at the time of the trial or on motion for new trial to the charge of the court, we shall not review such matters, and shall not reverse the case unless appellant is shown to have been injured. This statute is certainly adequate for the assertion of appellant's rights, for he can take two or three weeks, often, after the trial, in ascertaining the defects in the court's charge, and set up these real or supposed defects in the motion for new trial, which motion we are required to review, and reverse the judgment if the court has erred in a manner calculated to injure the rights of appellant. Less than this the State could not give. More than this appellant can not ask. In Pena v. State, 38 Texas Criminal Reports, 334,—among the earliest decisions by this court on this subject,—the Court say: "Under the recent act of the Legislature [Acts 25th Legislature, page 17] this court is prohibited from reversing a judgment for material error of the court in regard to charging the law, unless the error shall be excepted to at the time of the trial or on motion for new trial. As stated above, exceptions were not reserved, and, even if the court erred in not charging the law applicable to aggravated assault, and such failure was material error, this court would not be justified in reversing the judgment, unless exception was reserved to this omission of the court either at the time of the trial or on motion for new trial." Every member of this court has, first and last, rendered a decision re-enunciating this principle, and upholding the constitutionality of this statute.

We have been entertained both by the argument and appellant's able brief, and commend him for the great research and learning shown in the preparation thereof. But we can only repeat what has heretofore been said—that article 723, Code of Criminal Procedure, is in all respects constitutional, since it provides a complete, reasonable, perfect, and adequate remedy for the assertion of the rights of appellant under the Constitution of the State of Texas, if availed of at the time authorized by the statute. If he fails to avail himself of the remedies provided by the Legislature, he can not assert his rights; nor can we review or protect his rights, unless he comes within the purview of the statute authorizing the assertion of these rights.

We have carefully reviewed the other assignments of appellant in his motion for rehearing, and do not think any of them are meritorious. The error in the court's charge was not calculated to injure the rights of appellant. The motion for rehearing is accordingly overruled.

*Motion overruled.*

DAVIDSON, PRESIDING JUDGE (dissenting).—In the original opinion this court held the trial court committed error in giving certain charges, as well as in refusing requested instructions of appellant. The case was affirmed upon the theory that under article 723, Code of Criminal Procedure, the error complained of was not calculated to injure

the rights of accused. Appellant, in motion for rehearing, sought to bring in review the error of this court in holding that the error of the trial court was not material, or calculated to injure his rights. In the opinion on rehearing this question is not discussed by my brethren, but they sought to fortify their opinions in the Johnson case, ante, p. 87, and Bell's case, 58 Southwestern Reporter, 71, but overruled the motion for rehearing. I respectfully dissent, and hold the error was of such character as to require a reversal, and adopt the views of Mr. A. S. Fisher, appellant's counsel, as expressed in his elaborate and very cogent brief, as follows:

"At the Tyler term this court affirmed the judgment of the lower court, and in its opinion held substantially: (1) That the instructions of the lower court upon the trial of this cause were not the law of this case, and against the well settled law as often construed and announced by this court; (2) that the contention of appellant was correct, that the lower court erred in omitting to instruct the jury as contended for by him; (3) that, notwithstanding the errors of omission and commission of the lower court, and notwithstanding the fact that appellant had duly excepted to such errors, this court could not reverse, because of the restraining power of article 723, Code of Criminal Procedure, as amended in 1897, which, in effect, requires this court to look alone to the facts for the purpose of determining whether the error complained of was calculated to injure the rights of appellant. We respectfully suggest that this court is in error; (1) in holding that the Legislature can in any way bind or limit the judicial power or discretion of this court in the manner attempted by article 723, as amended; (2) in limiting the question of injury to one of fact, whereas an error calculated to injure the rights of defendant may be one of law as well as of fact, or may be a mixed question of law and fact. So much of article 723, which provides 'that, whenever it appears by the record in any criminal action upon appeal of a defendant that any of the requirements of the eight preceding articles have been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of the defendant,' is unconstitutional and void: (1) because it is a direct invasion of the power and province of the judiciary, and is violative of section 1, article 2, of the Constitution; (2) because it is violative of section 19 of the Bill of Rights, which provides that 'no citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land;' (3) because it is violative of section 13 of the Bill of Rights, which provides, 'All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law;' (4) because it is violative of the Fourteenth Amendment of the Constitution of the United States, which says, 'Nor shall any State deprive any person of life, liberty, or property without due

process of law;' (5) because it is violative of section 15 of the Bill of Rights, which provides, 'The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same and to maintain its purity and efficiency;' (6) because it is violative of section 10 of the Bill of Rights, which says, 'In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury.'

"Let us first inquire as to the meaning of the terms:

"1. 'Due course of the law of the land,' and 'remedy by due course of law.' This means, as applied to judicial proceeding, a course of proceeding according to those rules and principles which have been established in our system of jurisprudence for the protection and enforcement of private rights. It is imperative that there be a court of competent jurisdiction; that the proceedings be regular, and appropriate to the question involved; and that the trial be a fair one, and pursued under and according to the established mode of procedure theretofore ascertained and provided for the trial of like cases. Pennoyer v. Neff, 95 U. S., 714, 24 L. Ed., 565; Parsons v. Russell, 83 Am. Dec., 728, and note 731; Burton v. Platter, 4 C. C. App., 95, 53 Fed. Rep., 901, 10 U. S. App., 657; Brown v. Hummell, 6 Pa., 86; Zeigler v. Railroad, 58 Ala., 594. 'Due process of law,' or 'due course of law,' in a criminal case, requires a law describing the offense. The offense must be described in an accusation. The accused must be given his day in court. His trial must proceed according to established procedure, consisting of rules of pleading and practice. The admission of evidence for and against him must be according to established rules; and he must be convicted, if convicted, by the judgment of a court of competent jurisdiction, and the punishment must be authorized by law. The definition of the offense, and the authority for every step in the trial, must be found in the law of the land. Nothing essential can emanate from arbitrary power. The rights of the defendant and the duty of the court are equally under the fingers of the law. It is said in Hood v. State, 44 Alabama, 81: 'Due course of law, in its constitutional sense, means that every person who is charged with an offense shall be charged and tried as required by the laws of the land, and not otherwise. And for this purpose, in a criminal prosecution, the record must show that the accused is charged with an indictable offense according to the forms of the law, and that his trial has been conducted as the practice required by law prescribes. If these requisites, on the face of the record, appear to be wanting, it is the duty of this court to refuse to give judgment on motion, pointing out the deficiencies.' 2. 'In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury' and 'the right of trial by jury shall remain inviolate.' By this is meant, in felony cases, that the accused is not only entitled to be tried within a reasonable time by a jury of his peers, but, when tried, it must be a jury, when he pleads not guilty; and that each and every step in the trial must be conducted according to fixed

rules, regulations, and proceedings of law previously provided and enacted; that the jury must be the exclusive judges of the facts, under proper and appropriate instructions as to the law from the court; and that the law applicable to the case, as the law is, must be submitted by the court to the jury, that the jury may apply to it the facts. If this is not done, and the charge is so framed that the jury can convict upon a less degree of evidence than the law requires when the facts are applied to the law, then the accused has not had a fair trial; and when the Legislature seeks to authorize and empower a court to disregard the fixed rules, regulations, and mode of procedure provided for trial, and to review the case alone upon the facts to ascertain the question of injury, it impairs a right of fair trial by a jury, and the right of trial by juries no longer remains inviolate. There is no question of the power of the Legislature to enact rules of practice and modes of procedure; but it is denied that the Legislature has the power, after it has enacted rules of practice and provided modes of procedure, to enact any law, so long as such mode of procedure and rule of practice remains unrepealed, which will authorize this court to disregard them, or constitutional or other statutory rights of defendant, whether those rights flow from some mode of procedure or from some rule of practice, when such is the due course of the law of the land provided by the lawmaking power to carry out the constitutional guarantee 'that his right of trial by jury shall remain inviolate.' The Legislature, in the exercise of its legitimate power, has enacted modes of procedure and rules of practice, and its power to do so is not here denied. It has provided how the grand and petit jury shall be drawn. It has provided how the grand jury shall be impaneled and sworn. It has provided how the bill of indictment shall be returned. It has provided how the defendant may be arrested, and brought into court. It has provided how his attendance may be secured. It has provided how the petit jury shall be impaneled and sworn. It has provided how an impartial jury may be secured by means of challenge and otherwise. It has provided how, and at what time, the pleading of the State and defendant may be offered. It has provided him with forms of pleas. It has provided for the time and mode of the introduction of testimony. It has provided rules of evidence. It has provided for the argument of the case, and regulated its order. It has provided the manner in which the jury shall be instructed by the court. It has provided how the jury shall be kept together. It has provided how the jury shall return its verdict. It has provided for the defendant in presenting his motion for new trial and motion in arrest of judgment. It has provided the mode by which he may appeal his case. It has given him a mode by which he may save his exceptions (and thereby have error passed upon and considered by the court). All of these are legitimate matters of legislation, and constitute the 'due course of the law of the land,' as contemplated by the Constitution.

"But how about article 723 as it stands now? It does more than

prescribe the rule of practice or mode of procedure. It not only attempts to provide the mode of procedure, but seeks to declare its effect, and, in effect, says, though the Constitution guarantees that the right of trial by jury shall remain inviolate, and that the defendant shall have a speedy public trial by an impartial jury under the due course of the law of the land, yet his case shall not be reversed if he has not had such trial, and though it shall affirmatively appear from the record that every right guaranteed to him by the Constitution may have been violated. This court is not certainly prepared to sanction such an assumption of legislative power, and surrender its authority, the most sacred known to the law, the only safeguard of the citizen, to the legislative department of the government. It not only seeks to declare its effect, but the effect of each and every one of the 'eight preceding articles' mentioned therein. It, in effect, requires this court to ignore all errors of law, and look alone to the facts of the case. It authorizes—yea, compels—this court to affirm a case, though every right of the defendant may have been disregarded and ignored upon the trial of the case, and though no due course of the law of the land was observed. It compels this court to usurp the province of the jury, and to look alone to the facts of the case, though the Constitution guarantees to the defendant 'a speedy public trial by an impartial jury,' and that 'the right of a trial by jury shall remain inviolate,' and that its 'purity and efficiency shall be maintained,' and that the power to transgress this right is excepted out of the general powers of the government, and shall forever remain inviolate. It is not only an invasion and limitation of the powers of this court, but is a limitation of the rights of the citizen. A defendant, when charged with crime, is not only entitled to a trial by jury, but to a fair trial by jury; not only to be heard upon the facts, but upon the law and the facts. If he is guilty, his guilt is not to be determined from the facts, but from the law and the facts. He has the right, not only to have the facts passed upon and considered by the jury, but passed upon and considered legally by the jury. We are willing to concede, and do concede, that the Legislature, at the time it enacted article 723, had the power, without in any way affecting the rights of the defendant, because his rights had not been attacked, to have repealed each and all of the eight sections referred to thereby, and could have, in the exercise of its legitimate power, if it had seen proper, so amended each article as to prescribe a different mode of procedure. But our answer is that it neither amended nor repealed any of such articles, but left each and every one of them in full force and effect as the rule of procedure, prescribing the due course of law to be followed by the trial courts in cases of felony, without substituting any other rule of procedure in its place. In fact, so far from repealing such articles, they are referred to in article 723, recognized, and reaffirmed; but their effect is sought to be limited, and the judicial discretion of this court is sought to be controlled thereby. In fact, it is nothing more nor less than a legisla-

tive mandate to this court to disregard the due course of the law of the land, to look·not to the mode prescribed for the trial of the citizen, and to disregard both errors of omission and commission, and not to reverse, if, in the opinion of the court, the facts, regardless of the law, tend to show the guilt of the defendant appealing, whether he has been legally tried or not, or whether such facts have not been legally passed upon by the jury under the law, nor properly submitted to them by the trial court. This doctrine is monstrous. It is a strict adhesion to legal forms and procedure that constitutes the safeguard of the citizen, and protects him in those constitutional guarantees which are thrown around the humblest in the land. Take away, destroy, or impair modes of procedure, and due course of the law of the land becomes impossible, and the constitutional guarantees dead letters. The judiciary system becomes a mockery and a mobocracy. It is the mob only who look alone to the facts in disregard of legal forms and procedure, and who know 'no due course of law.' The law is 'that a legislative body can not compel the courts to adopt a particular construction of law which the Legislature permits to remain in force, and that, unless the declaratory act constitutes an express or implied amendment of the original act, it will not be binding on the courts, even though it be entirely prospective in its operation, and expressly confined to future cases.'

"There is a broad distinction between those acts of the Legislature which limit the right of the citizen charged with crime, and who may be tried for such, and those acts which enlarge his rights. The State, through its Legislature, can enlarge the constitutional right of the citizen, but can not limit; nor can it limit a statutory right unless first destroying the statute in the mode pointed out in the Constitution. As long as the statute conferring the right remains, the right itself remains, and must be observed. We know of no stronger illustration than article 723. As it stood before the Act of 1897, a defendant on trial had certain statutory rights guaranteed him by the eight preceding articles mentioned in 723. These rights were not only guaranteed, but this court was carefully charged with the duty of seeing that such rights were observed by the lower courts, and were required to reverse the case for new trial if such rights were disregarded. This article, as it then stood, having been enacted at the same time of the enactment of the eight preceding articles, was clearly constitutional, because so far from limiting the right of the citizen, it gave him the mode by which this right could be guaranteed, and made it incumbent upon this court to protect such guarantee. But not so with article 723 after its amendment. The amendment, without in any way taking away or repealing the mode of procedure as provided by the eight preceding articles, seeks to limit the right and to destroy the guarantee, thereby limiting the statutory and constitutional rights of the citizen, invading the province of this court, and enlarging the powers and rights of the State, because it is a maxim well established 'that there can be no limitation of the rights of a citizen without at the same time enlarging the

powers of government.' It, in effect, says, 'Though it may appear affirmatively from the record that the citizen has not had a fair trial under the due course of the law of the land, as prescribed and provided in the eight preceding articles, and though each and all the requirements of such articles may have been disregarded, this court shall not reverse where, from the facts, it appears that the defendant is guilty, notwithstanding any material error of law shown by the record to have been committed upon the trial of the case.' Whether such be the effect or not, this court, in the case at bar, has virtually so held. Are we going too far in making this assertion? We think not. Why? Because this court admits material error in the charge of the lower court, and looks alone to the facts to ascertain whether the error was calculated to injure the rights of the defendant. If such be the scope and meaning of the act in question, can this court say that it does not invade its province, and, if not take away, at least trammel, the judicial discretion of this court? What power has the Legislature to say, 'You shall not reverse a case for error?' Is such power within the legislative department of the government? Is the right to reverse a case for error, or to say when the court shall not reverse, in any sense a legislative question? If the Legislature, after having provided rules of practice and modes of procedure, can, by a legislative mandate, instruct this court as to its judgment, and as to the effect of the judgment it is called upon to review, then it possesses a power certainly not contemplated by the framers of the Constitution; and the line of demarkation established by section 1, article 2, of the Constitution is destroyed.

"This court is in existence to-day by reason of the Constitution of this State, and its power as a court is derived from that instrument, and does not depend upon legislative enactment in any sense for its existence. When this court was provided for by the Constitution, it was intended thereby that it should have the full power of a court, with its judicial discretion in matters over which it had jurisdiction untrammeled. Nor is there anything in the Constitution which in any way points to the conclusion that the Legislature can in any manner control, regulate, or limit the judicial discretion of this court when once its jurisdiction has attached to the given case. Even section 5, article 5, confers no such power upon the Legislature when it says, 'The Court of Criminal Appeals shall have appellate jurisdiction co-extensive with the limits of the State in all cases of whatever grade, with such exceptions and under such regulations as may be prescribed by law.' We do not suppose that anyone, in the face of section 1, article 2, of the Constitution, will claim that the Legislature has the power to do a judicial act, or has the power to direct this court as to the kind of judgment it shall render, or as to the effect or construction it shall give to the eight preceding articles mentioned in article 723, or as to whether it shall consider this error or that error when such error is apparent upon the face of the record itself. The very effect of the Constitution, in creating this court, was that it could

act as a check upon the lower courts, and correct errors of such courts. In other words, it is strictly a court of review, created without original jurisdiction (except in habeas corpus proceedings, etc.), for the express purpose of the exercise of appellate jurisdiction, and power to correct errors of the lower courts, and to compel an observance by them of the rights of defendants in criminal trials, and for nothing else. The Constitution, having guaranteed the right of fair trial by due course of law, created this court as one of the remedies for the enforcement of such rights. As an evidence of this fact, the right of appeal is conferred upon defendants in criminal cases, while no such right is given the State. This being a constitutional court, deriving its powers of supervision from that instrument, can the Legislature, after having provided a mode by which your jurisdiction can attach to a given case, take away your power to review by so hedging it with rules under the pretense of procedure as to render nugatory the object and purpose of the Constitution? There is a vast difference between the power to provide a rule of practice or mode of procedure and the power to construe or prescribe the effect of such rule or mode. An error will flow from the nonobservance or the disregard by the courts of such rule or mode when such rule or mode has been prescribed as a judicial guide. An error, then, is the effect of a disobedience of the rule or mode, and is not the rule or mode of procedure itself. There is nothing to be found anywhere in the Constitution which gives this character of power to the Legislature. Upon the contrary, the Legislature is confined, by such instrument, in its power to construe and interpret the meaning and effect of rules and modes of procedure, exclusively to such rules and modes as each house thereof may prescribe for its own management and procedure. Sec. 11, art. 3. Now, the pertinent inquiry arises: Can the Legislature in any way be controlled by any construction or effect that this court may give to such rule or mode of procedure provided by either house for its own proceedings, or could the court enforce its mandate in the event of a disregard of it by the Legislature? The question answers itself. Why? Because section 1, article 2, of the Constitution stands in the way. And because such power is conferred by section 11, article 3, exclusively upon the Legislature, just as all matters involving judicial discretion, and the effect to be given to its proceedings, and the construction of the law is conferred upon and limited to the judiciary by section 1, article 2, section 1, article 5, and section 13, article 1, of the Constitution. The question and effect of error, then, or whether there be error, is, and always has been, held to be strictly a judicial question; and, if the power of this court in such matters can be controlled by the Legislature, then the Legislature can, by its legislative mandate, take away from this court the power to review and reverse any case. If it can say to this court, 'You can not reverse unless the error appearing from the record was calculated to injure the rights of the defendant,' it can say, 'You shall not reverse at all.' Once let down the bars, and the legislative

herd, unrestrained by judicial powers in judicial matters, will soon trample out of existence all judicial discretion. Now, in the light of section 1, article 2, and the other articles of the Constitution referred to, we respectfully ask this court: Is it in the power of the Legislature to say that a law which is enacted for the protection of the citizen, and which remains unrepealed, shall be disregarded by the courts? Is the question of error in any sense a legislative question, or is it not, upon the other hand, purely judicial? By what authority does the Legislature say to a court, 'You may disregard a plain statutory law affecting a constitutional right,' while the law remains unrepealed? We respectfully assert this is not the making of a law, nor is it the exercise of a legislative power to make rules of practice and provide modes of procedure. Yet this is substantially what the Legislature, in its mandate, says to this court. To the lower court it says: 'You may disregard any of the eight preceding articles prescribing the due course of the law of the land for the trial of a defendant charged with crime, and, while your records may show this, yet, if the facts show him to be guilty, your judgment shall not be disturbed;' while to this court it prohibits a reversal, though it may affirmatively appear from the record that the requirements of law have been disregarded, and seeks to compel this court to affirm, when, in the opinion of this court, the facts tend to show the defendant's guilt, though every legal right of his in the ascertainment of such facts may have been disregarded by the lower courts, and such disregard is affirmatively shown by the record. We respectfully submit that such a statute is nothing more nor less than a legislative piracy, preying upon the judiciary and the citizen at the same time—upon the judiciary by an invasion of its province; upon the citizen by the ascertainment and establishment of his guilt in utter disregard of law previously enacted, and yet in force, providing as to the means, in connection with the facts, of ascertaining and determining his guilt. Here we have an anomaly in law. The courts are expressly authorized and licensed by this act not only to disregard the law, but this court is restrained, under certain circumstances, from enforcing the defendant's legal rights; while the defendant is being prosecuted and punished for doing that which the courts are authorized to do, viz., violate the law.

"Now, bear in mind that the question is not here as to the power of the Legislature to take away the remedy. Nor is the question here as to whether a person charged with crime has a vested right in any particular remedy, so long as a remedy is afforded to carry out constitutional guarantees. These questions do not enter into this case, because the remedy in the trial of criminal cases has long ago been enacted by the Legislature, and a part of that remedy, the eight preceding articles, is still upon the books in full force by operation both of the lawmaking power, which enacted them, and the judicial power, which has often construed them, and given to them certain legal and judicial effect. The Legislature, then, having permitted the remedy to remain,

can not impair that remedy by seeking to compel the courts to give to it a legislative construction instead of a judicial construction; nor can they say to the courts that they can disregard the remedy which the lawmaking power has legally provided as a part of the machinery of government for the ascertainment of the guilt or innocence of a citizen upon trial. Nor does the question of the power of the Legislature to pass a retrospective, retroactive, or ex post facto law enter into this case, because there has been no effort made by the Legislature to repeal or amend any of the eight preceding articles, and to substitute other remedies in their places. They have permitted each and every one of said articles to remain as originally enacted; and to this day are a part of the statutory mode of procedure governing the lower courts in the trial of criminal cases. While permitting the remedy to remain, the Legislature contents itself with its mandate to the lower courts to disregard such remedy, and to this court not to reverse unless such disregard was calculated to injure the rights of appellant. Article 723 does not attempt to give a new remedy, nor repeal an old one, but seeks to compel the courts to disregard existing remedies. We deny their constitutional power to do this, or to in any such way give to the law an effect it did not have when originally passed, and to compel this court to give to it a construction nor originally intended.

"We will now review the authorities bearing upon the question at issue first calling the attention of the court to the case of Johnson and Bell, reported in 58 Southwestern Reporter, at pages 60 and 72, decided by this court. In the case of Johnson this court say: 'We find no bill of exceptions nor statement of facts in the record. Appellants urge error in this court for the first time as to the charge of the court. If article 723 is constitutional, then, however erroneous the charge of the court may be, appellants having reserved no exception in the court below, either by bill or motion for a new trial, they are without remedy at law. We think said article is constitutional, and, unless appellants complain of the charge below, and reserve that complaint in a bill of exceptions or in motion for a new trial, then such error can not be reviewed in this court, however erroneous or fundamental it may be. * * * If appellant excepts to the ruling of the court by bill or in motion for new trial, then he has a perfect, complete, and adequate remedy provided by statute for the assertion of his rights.' To the same effect is the other Johnson case and the Bell case. It will therefore be observed from an inspection of these cases that the only question raised and decided by this court is the power of this court to review and consider error when not reserved by bill of exceptions or in motion for a new trial, and whether the Legislature has the constitutional power to require defendants to reserve error, either by bill or in motion for new trial. The question raised by us in our motion for rehearing was not passed upon in either of those cases, nor was the court called upon, in the determination of the particular question then before the court, to consider the question we now present. In the case at bar we

waive, for the sake of argument, the question as to the power of the Legislature to require error, to be considered, to be saved by bill or in motion for new trial, and treat so much of article 723 as requires the error to be thus saved as being constitutional, because in this case we have duly saved our exception, and therefore the question of exception is not in this case. This we understand to be in strict accord with the holding of the majority of this court in the Johnson and Bell cases; nor do we understand from a reading of those cases that it was the purpose of the court to go further in its holding as to article 723. The question here presented has not, to our knowledge, been heretofore passed upon by this court, and we therefore ask this court to distinguish this case from those of Johnson and Bell. Nor is the question presented by us decided in any of the cases from Missouri, Wisconsin, Nebraska, and New York referred to by this court in its opinion in the Johnson case. The only question decided in the Missouri cases, except the Davidson case, 73 Missouri, 428, is whether error will be considered when not properly saved by exception, etc. State v. Reed, 89 Mo., 171, 1 S. W. Rep., 225; State v. Dunn, 73 Mo., 586; State v. McCray, 74 Mo., 303; State v. Preston, 77 Mo., 294; State v. Emory, 79 Mo., 461; State v. Davidson, 73 Mo., 428; People v. Guidici, 100 N. Y., 503, 3 N. E. Rep., 493; People v. Kelly, 113 N. Y., 647, 21 N. E. Rep., 122; Williams v. State, 61 Wis., 290, 21 N. W. Rep., 56; Flower v. Nichols, 55 Neb., 314, 75 N. W. Rep., 864. In the New York case of People v. Guidici the question presented was upon the admission of evidence. The court held (notwithstanding article 527 of the Code): 'Errors upon a criminal trial can be made available in this court only by exception duly taken on the trial. This rule is not changed by the provisions of the Code of Criminal Procedure, article 527, authorizing the Supreme Court on appeal in criminal actions to grant a new trial where the judgment is against the evidence and the law, although no exceptions were taken on the trial.' To the same effect is the New York case of People v. Kelly. It seems from these cases that the New York court disregarded such legislative action as is contained in said article 527. The Nebraska case of Flower v. Nichols (a civil suit) does not in any way present the question here under discussion. It simply holds: 'To enable instructions to be reviewed, they should be separately assigned in a motion for new trial as well as in the petition for error. A judgment will not be reversed for the giving of an instruction which could not have prejudiced the complaining party.' In the Wisconsin case of Williams v. State the court say: 'Some exceptions were taken to the instructions given the jury. After reading the instructions, we are unable to find anything erroneous in them.' 61 Wis., 292; 21 N. W. Rep., 62. The other questions relate to remarks of prosecuting counsel, to which no exceptions were reserved. The court say, 'Not having been excepted to, we will not consider the remarks.' And to evidence to which no exceptions were reserved, the court would not consider such objections. The Davidson

case was reversed, and defendant discharged, because of fundamental error, though it does not appear that any exceptions were saved or error assigned. From this last case it seems that the purpose of the Supreme Court of Missouri was to hold that the statute of Missouri, or, rather, the power of the Legislature to enact the statute, was limited to the right to require exceptions to be saved only as to those matters, strictly speaking, arising dehors the record, though, however, it is not necessary to determine that question in this case.

"Having referred to and reviewed the above authorities, we will now call to the consideration of the court authority from a great many States bearing upon the question at issue, and which we believe sustain our contention.

"It is said in the case of Powell v. State, 17 Texas Criminal Appeals, 350: 'The Legislature has no authority to interpret or declare a matter of constitutional construction, nor can it set aside a construction of a constitutional provision which has become fixed and settled by judicial determination. With regard to its own enactments, the rule is that, as the Legislature can not set aside the construction of the law already applied by the courts to actual cases, neither can it compel the courts for the future to adopt a particular construction of a law which the Legislature permits to remain in force. To declare what is or has been is a judicial power; to declare what the law shall be is legislative. One of the fundamental principles of our government is that the legislative power shall be separate from the judicial. In the case of Files v. Fuller, 44 Arkansas, 273, the Supreme Court says: 'No Legislature has the power to prescribe to the courts rules for interpretation, or to fix for future Legislatures any limit of power as to the effect of their action.' To the same effect is the case of Cotton v. Brien, 6 Rob. (La.), 115; also the case of City of New Orleans v. Insurance Co., 26 Law. Rep. Ann., 499. In Gough v. Pratt, 9 Maryland, 526, it is said: 'A legislative interpretation of what was the previous law on the subject upon which an act of the Legislature may be passed is not binding upon the courts.' In Householder v. City of Kansas, 83 Missouri, 488, the Supreme Court says: 'A legislative interpretation of the Constitution is not binding on the judiciary. If the general assembly should, by enactment, declare what injuries are to be considered damages under that section, it would not be obligatory upon the courts to follow such legislative construction. The making of a constitution is but legislation; legislation, however, of the most solemn character. And, if the General Assembly can place a construction upon it binding upon the courts, then it can make and unmake constitutions at its pleasure.' In the case of Association v. Graham, 7 Nebraska, 173, it is said: 'A statute which is substantially in the nature of a mandate to the courts to construe and apply a former law, not according to judicial, but according to legislative judgment, is inoperative, and can not control the courts in interpreting the law and declaring what it is.' In the New York case of Salters v. Tobias, 3 Paige, 338, it is held that 'in the

United States, where the legislative power is limited by written constitutions, a declaratory statute can not have the legal effect of depriving an individual of a vested right, or of changing the rule of construction as to a pre-existing law.' In Reiser v. Association, 39 Pennsylvania, 137, it is said: 'The Legislature has no power to direct the judiciary in the interpretation of acts of assembly previously passed, or require it to change an interpretation already put upon them. Such mandate is unconstitutional and void.' The case of Governor v. Porter, 5 Humphries, 165, says: 'A mandate of the Legislature to the judiciary, directing what construction shall be placed on existing statutes, is an assumption of judicial power, and unconstitutional.' See also Picquet's case, 5 Pick., 64; Sanders v. Cabaniss, 43 Ala., 173; Prout v. Berry, 2 Gill, 147; Ex Parte Ulrich (D. C.), 42 Fed. Rep., 587; State v. Powell (Miss.), 27 So. Rep., 927, 48 Law. Rep. Ann., 652; State v. Noble, 118 Ind., 350, 21 N. E. Rep., 244, 10 Am. St. Rep., 143, 4 Law. Rep. Ann., 101. It is held in Brown v. Circuit Judge, 75 Michigan, 274, 42 Northwestern Reporter, 827, 13 American State Reporter, 438, 5 Lawyers' Reports Annotated, 226, that the Legislature can not deprive the Supreme Court of its revisory jurisdiction over all other State tribunals, and that the Legislature may change the formalities of legal procedure, but it can not make changes so as to impair the enforcement of rights. In Ex Parte Griffiths, 118 Indiana, 83, 20 Northeastern Reporter, 513, 10 American State Reporter, 107, 3 Lawyers' Reports Annotated, 398, it is said: 'It is, indeed, everywhere agreed that constitutional courts are not subject to the will of the Legislature; for, as said in Wright v. Defrees, 8 Indiana, 298, the powers of the three departments are not merely equal; they are exclusive in respect to the duties assigned to each; they are absolutely independent of each other.' In the case of Houston v. Williams, 13 California, 24, 73 American Decisions, 565, Judge Field, speaking of the court, says: 'In its own sphere of duties this court can not be trammeled by legislative restrictions. Its constitutional duty is discharged by the rendition of decisions. The Legislature can no more require this court to state reasons for its decisions than this court can require for the validity of statutes that the Legislature shall accompany them with reasons for their enactment. * * * The court must, therefore, exercise its own discretion as to the necessity of giving an opinion upon announcing judgment, and, if one is given, whether it shall be orally or in writing. In the exercise of that discretion the authority of the court is absolute. The legislative department is incompetent to touch it. The truth is, no such power can exist in the legislative department, or be sanctioned by any court which has the least respect for its own dignity and independence.' To the same effect are the cases of Vaughan v. Harp, 49 Arkansas, 160, 4 Southwestern Reporter, 751, and Speight v. People, 87 Illinois, 595. The Supreme Court of Pennsylvania, speaking through Chief Justice Gibson, in the case of De Chastellux v. Fairchild, 15 Pennsylvania, 18, 53 American

Decisions, 570, says: 'If anything is self-evident in the structure of our government, it is that the Legislature has no power to order a new trial, or to direct a court to order it, either before or after judgment. The power of ordering a new trial is judicial, but the power of the Legislature is not judicial. It is limited to the making of laws, not to the exposition or execution of them. The functions of the several parts of government are thoroughly separated and distinctly assigned to the principal branches of it—the Legislature, the executive, and the judiciary—which, within their respective departments, are·equal and coordinate. Each derives its authority, mediately or immediately, from the people, and each is responsible, mediately or immediately, to the people for the exercise of it. When either shall have usurped the powers of one or both of its fellows, then will have been effected a revolution, not in the form of the government, but in its action. There will then be a concentration of the powers of the government in a single branch of it, which, whatever may be the form of the Constitution, will be despotism; a government of unrestricted, irresponsible, and arbitrary rule. It is idle to say the authority of each branch is defined and limited in the Constitution if there be not an independent power able and willing to enforce the limitations. Experience proves that it is thoughtlessly and habitually violated, and the sacrifice of individual rights is too remotely connected with the objects and contests of the masses to attract their attention. From its very position it is apparent that the conservative power is lodged with the judiciary, which, in the exercise of its undoubted right, is bound to meet every emergency, else causes would not only be decided by the Legislature, but sometimes without hearing or evidence. The mischief has not yet come to that, for the Legislature has gone no further than to order a rehearing on the merits. It has become the duty of the court to temporize no longer, but to resist, temperately, though firmly, any invasion of its province, whether great or small.' · To the same effect is the New Hampshire case of Merrill y. Sherburne, 1 New Hampshire, 199, 8 American Decisions, 52, which says: 'No particular definition of judicial power is given in the Constitution, and in considering the general nature of the instrument none was to be expected. Critical statements of the meaning in which all important words were employed would have swollen into volumes, and when those words possessed a customary signification a definition of them would have been useless; but "powers judicial," "judiciary powers," and "judicatories" are all phrases used in the Constitution, and, though not particularly defined, are still so used to designate with clearness that department of government which it was intended should interpret and administer the law. On general principles, therefore, those inquiries, deliberations, orders, and decrees which are peculiar to such a department must, in their nature, be judicial acts. Nor can they be both judicial and legislative, because a marked difference exists between the employments of judicial and legislative tribunals. The former decide

upon the legality of claims and conduct; the latter make rules upon which, in connection with the Constitution, those decisions should be founded. It is the province of the judges to determine what is the law upon existing cases. In fine, the law is applied by the one, and made by the other. To do the first, therefore—to compare the claims of parties with the law of the land before established—is in its nature a judicial act. But to do the last—to pass new rules for the regulation of new controversies—is in its nature a legislative act; and if those rules interfere with the past or present, and do not look wholly to the future, they violate the definition of law "as a rule of civil conduct," because no rule of conduct can with consistency operate upon what occurred before the rule itself was promulgated. * * * The grant of a new trial belongs to the courts of law from immemorial usage. The power to grant a new trial is incidental to their other powers.' In the case of State v. Fleming, 7 Humphries, 152, Judge Turley, for the court says: 'This was a prosecution on behalf of the State against Andrew Fleming and Alfred G. Cosby for retailing spirituous liquors contrary to the provisions of the Act of 1838. Pending the prosecution, and before conviction, the Legislature passed the Act of 1846, by which, under certain restrictions, it became lawful to retail spirituous and other liquors. At the same session and subsequent to the passage of the act, it was resolved that no fine, forfeiture, or imprisonment should be imposed or recovered for the offense of tippling under the Act of 1838, and that all causes pending in any of the courts for such an offense should be dismissed." Subsequent to the passage of the statute and resolution, but before their promulgation, the defendants were tried and convicted. Before the judgments were executed, the defendants, by petition, superseded them upon the ground that the resolution of 1846 freed and discharged them of all responsibility. They were thereupon discharged by the circuit judge, from which order the Attorney-General appeals to this court. The question presented for our consideration is whether the resolution of the Legislature passed in 1846 is a constitutional exercise of power. We think not. * * * The powers of the State of Tennessee are vested in legislative, executive, and judicial departments, each separate and distinct from the other, with their powers and duties well defined by the Constitution, and by which each is kept within its appropriate sphere of action. The Legislature can make the law, but the courts must expound and execute it, with the aid of the executive, when his action may become necessary for that purpose. The Legislature has no power to interfere with the administration of justice, either criminal or civil, in the courts. A resolution that a criminal or class of criminals shall be discharged by the court is, therefore, necessarily an assumption of power not warranted. After conviction the Governor may pardon, but before conviction the Attorney-General and the courts are the only power that can discharge without acquittal, and this by nolle pros. We are therefore constrained to hold that the resolution under which these defendants claim their discharge is void for

the want of power in the Legislature to pass it.'  In the very able case of Lawson v. Jeffries, 47 Mississippi, 686, 12 American Reports, 342, where, by an ordinance, the constitutional convention sought to invade the powers of the judiciary by ordering the granting of new trials in judgments formerly rendered, the Supreme Court of that State held the ordinance void.  Justice Tarbell, in a very able opinion, showing great learning and research, wherein nearly all of the authorities upon this subject are collated, says: 'With the adoption of the Federal Constitution, arbitrary power, which had theretofore defied the rights of persons and property, was denied an existence, whether in a national or State government, or with the people in their sovereign capacity; and there was ordained a sacred and inviolable separation of legislative, executive, and judicial authority.  These principles are with us fundamental, and can not be disregarded by a constitutional convention any more than the legislative, executive, or judicial departments of the government can exercise the powers of each other.  When they do, their acts are void.  *  *  *  If a legislative body may grant a new trial, it may order a continuance, annul a judgment, suspend a trial, direct a judgment to be entered, and otherwise interfere with the discretion and independence of the judiciary.  The evils that would flow from such an assertion of legislative power are too apparent to be enumerated, and need not be here undertaken.  Placing the solution of the case at bar upon the sole ground of the usurpation of judicial attributes by the convention, we waive as unnecessary a discussion of the vexed questions of vested rights, the obligation of contracts, retrospective legislation, due process of law, property in judgments, remedial laws, with incidental and kindred matters, propounded and discussed in nearly every case involving any one of this family of questions, and by which cases we are sustained in the result herein aimed at.'  The ordinance was held void as an interference with judicial powers.  In Ex Parte Darling, 16 Nevada, 98, 40 American Reports, 495, it is said: 'The whole judicial power of the commonwealth is vested in courts.  Not a vestige of it belongs to the Legislature.  The trial, conviction, and sentencing of criminals are judicial duties, and duration or period of the sentence is an essential part of a judicial judgment in a criminal record. . Can it be reversed or modified by a board of prison inspectors, acting under legislative authority?  If it can, what judicial decree is not exposed to legislative modifications?  From what judicial sentence may not the Legislature direct "deductions to be made, if this act be constitutional?"  What they may do indirectly they may do directly.  If they may authorize boards of inspectors to disregard judicial sentences, why may they not repeal them as fast as they are pronounced, and thus assume the highest judicial functions?'

"Your honors, we have referred you to cases from a great many different States, our purpose being not only to fortify and sustain the position we have taken, but to show this court how carefully is guarded the judicial power of the different States, and has been by the courts,

almost since the beginning of constitutional law in this country. The history of American jurisprudence shows that it. was only during the dark period of reconstruction—that terrible period of centralization—that the courts only for a little while lost sight of those barriers which separate the executive, legislative, and judicial departments of government.

"We will now present the second proposition, viz: This court is in error in limiting the question of injury to one of fact, whereas an error calculated to injure the rights of defendant may be one of law as well as of fact, or may be a mixed question of law and fact; and we submit this proposition. 'The misdirection of the jury as to the law in a material matter is a violation of substantial right, and therefore calculated to injure the rights of the defendant.' Bishop v. State, 43 Texas, 390. Is that portion of the charge upon the question of force and resistance, complained of, a vital question? This court has held that the lower court misdirected the jury as to the law when it gave the following charge, to wit: 'You are instructed that, in order to constitute the offense of assault with intent to rape, it must be shown by the evidence beyond a reasonable doubt that the defendant made an assault upon the person of the witness Beulah Walker, as alleged, and that at the time of such assault, if any, the defendant had a specific intent to have carnal knowledge of the said Beulah Walker by force, and without her consent, and that he intended to use such force, if necessary, as would be sufficient to overcome such resistance on the part of Beulah Walker as she should make.' Now, in what does the error in this instruction consist? It is in permitting the jury to convict upon a less degree of force on his part and a less degree of resistance on her part than the law requires. Then here is a clear, palpable, and material legal injury to the rights of the defendant. Why? Because the defendant having the legal right to be tried by a jury, and the right to have the jury apply the facts to the law as it is written in the books, it is the duty of the court in its charge to instruct the law correctly, particularly as the jury are required under their oaths to receive the law from the court; and a court which, by its instructions, permits a jury to convict upon a less degree of evidence than the law requires, invades the province of the jury, and permits them to punish for an offense not legally established. This court says, in effect, that the vice of the lower court's instructions consists in failing to state 'that the jury must believe from the evidence beyond a reasonable doubt that the prosecutrix put forth her utmost efforts to prevent appellant accomplishing his purpose, considering the relative size and strength of the parties, the conditions surrounding them at the time, and other circumstances of the case.' Why is this the vice? Because both the questions of force and resistance are the material questions to be considered by the jury in cases of this kind; and any charge which seeks to eliminate or limit either is error, and an injury to the defendant. In fact, this court, in its opinion in this case, says: 'Force on the part

of the prosecutrix in resisting to the utmost the efforts on the part of the appellant to accomplish the offense is a criterion by which the consent is to be tested; for, if no resistance to the carnal act is made by the prosecutrix, the presumption obtains that she consented to the act.' Did the lower court so instruct the jury? Did the jury, who must be the exclusive judges of the facts, the credibility of witnesses, and the weight to be given to their testimony, have an opportunity to pass upon these facts in the manner required by law? No. Upon the contrary, they were told, in effect, that they were authorized to find the defendant guilty 'if he intended to use such force, if necessary, as would be sufficient to overcome such resistance on the part of Beulah Walker as she should make.' Yet this court holds that it was not such an error as was calculated to injure the rights of appellant, and in doing so looks alone to the facts, substituting its judgment for that of a jury, and in support thereof says, 'But here the prosecutrix has used all the force necessary, since that used by her accomplished all that she sought, i. e., escape from the lascivious embraces of appellant.' Your honors, is this right? Is this the law? Suppose that no charge had been given at all; suppose that the lower court had instructed the jury that no resistance on her part was necessary; suppose the lower court had rested the case upon the specific intent of the accused alone, without any act going to show force; yea, suppose he had instructed the jury to bring in a verdict of guilty,—would this court look alone to the facts to ascertain whether such error was calculated to injure the rights of appellant, and, after having admitted the error, refuse to reverse, because, in its opinion, defendant was guilty under the facts? If so, what becomes of the constitutional guarantee of the right of trial by jury under the due course of the law of the land? There is no difference between a material error and an error calculated to injure the rights of defendant. This court has held, in effect, that the error of the lower court is material; because the error relates to a substantial right of the defendant, and permits his conviction upon a less degree of force and a less degree of resistance than the law requires in this case, but plants itself upon the facts and determines the question of injury to defendant alone upon the facts, without reference to his legal rights, and ignores his right to have the jury instructed as the law requires. In order to sustain and uphold article 723, this court, in effect, ignores substantial provisions of the statute, which are thrown around the defendant to safeguard his rights, both constitutional and statutory. Is article 723 any more binding upon the conscience and judgment of this court than article 816 of the Code of Criminal Procedure, which says that, when the court has misdirected the jury as to the law (we will add, 'in a material matter'), he shall have a new trial? Is it any more binding than article 715, where the law—that law which has been provided as a mode of procedure, and constitutes the due course of the law of the land—says 'that the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the

law applicable to the case'?   The very purposes of these two articles are
to safeguard the rights of the defendant, and to prevent either courts or
juries going wild, and riding facts without a legal bridle.   The purpose
is to assist in carrying out the constitutional guarantee 'that the right of
trial by jury shall remain inviolate, and that it shall be maintained in
its purity and efficiency.'   It was never intended by the Constitution or
by any statutory provision that the laws of this State could be dis-
regarded, to enable a court, by looking alone to the facts, to convict a
citizen.   If such had been the intention, instead of giving us constitu-
tional guarantees, and hedging those guarantees with protective statutes
in the form of modes of procedure and rules of practice, we to-day would
not have those enlightened provisions of the Constitution which appear
in the Bill of Rights, nor those carefully worded and more carefully
guarded provisions of the statute in the shape of rules of practice and
modes of procedure, which stand as the handmaiden to those constitu-
tional guarantees, grown hoary in the service of the Anglo-Saxon race.

"Now, let us place ourselves in the place of the defendant, and view
the resistance of the prosecutrix, together with her consent, from his
standpoint at the time and place of the alleged assault.   This we under-
stand to be in conformity with the holding and opinion of this court in
this case, because in its opinion this court says, 'We therefore hold that
the contention   *   *   *   insisted upon by appellant in his brief as
error is well taken.'   We claimed in our brief upon the former hearing
that not only was the charge given not the law of the case, but that the
court ought to have instructed the jury as a part of the law as follows:
'If you believe from the evidence, or have a reasonable doubt thereof,
that the defendant did assault Beulah Walker at the time and place
alleged with the specific intent to have carnal knowledge of her by force,
and that she consented thereto, you will find him not guilty; or if you
believe from the evidence, or have a reasonable doubt thereof, that he
was led to believe by said Beulah Walker, by her acts, conduct, and the
surrounding circumstances at the time, that she was consenting, as
viewed at the time from his standpoint, you will find him not guilty.
The question of consent or nonconsent of the witness Beulah Walker is
a fact to be determined alone by you from all the facts and circum-
stances surrounding the transaction at the time, as well as before and
subsequently thereto.   It is the duty of a woman capable of resistance,
when carnal intercourse is sought to be had with her by force, to resist
such attack with all means in her power, if necessary, short of serious
personal injury to her, or the fear of such serious personal injury, to
prevent the consummation of the carnal act; and in determining the
question of consent or nonconsent of the party assaulted, as well as the
intent of the party assaulting, you may look to the force used, if any, the
resistance offered, the relative strength of the parties, and other circum-
stances surrounding the transaction.'   Again, this court says: 'However,
article 723, Code of Criminal Procedure, provides, in substance, that

we shall not reverse a case unless the error complained of was calculated to injure the rights of appellant. Was this calculated to do this? We think not, since the undisputed evidence shows that the prosecutrix resisted the efforts of appellant successfully, and finally fled from his presence, in the nighttime, to the house of a relative. If there had been any evidence indicating consent on her part, or, rather, a lack of resistance, then a charge of the character insisted upon by appellant's counsel would have become necessary, and its absence would have probably injured the rights of appellant. But here the prosecutrix has used all the force necessary, since that used by her accomplished all that she sought, i. e., escape from the lascivious embraces of appellant.' Is this court absolutely correct in its interpretation and construction of the testimony, of the purposes and intent of the defendant, of the motives of the prosecutrix? Is there no other construction or interpretation to be given? Does it follow as an absolute and established fact, assuming that the resistance of the prosecutrix was perfect, as it appears to this court, that the defendant was guilty of an assault with intent to rape, and nothing else? All of these facts, as assumed by this court, may be true, and yet the defendant may not be guilty of the higher offense of assault with intent to rape, and yet guilty of the lesser offense of aggravated assault. The question depends entirely upon his intent, and how he at the time and place viewed her conduct and resistance. As we said before, there must be a double intent to make a crime of assault with intent to rape,—the specific intent of the man to rape, and the intent of the woman that he should not have carnal knowledge of her, if she could prevent it; while in cases of aggravated assaults of this character the guilt of defendant may or it may not depend upon the resistance or other conduct of the woman. A woman may not resist at all, and yet not consent, in cases of aggravated assault; still defendant might be rightfully convicted. Upon the other hand, she may resist with all of her power, and either drive defendant off or flee from 'his lascivious embraces,' and yet defendant be guilty of nothing more than aggravated assault. A man may intend to have sexual intercourse with a woman, and may use a certain degree of force, and yet not be guilty of an assault to rape, while he would be guilty of an aggravated assault. Nothing, then, can make a case of an assault with intent to rape only when it is made such by both the law and the facts. Human experience teaches that no woman, except she be a prostitute, will instantly yield her person and all its sacredness to the lascivious approaches and desires of man, though she may be weak in moral training; and that the brightest jewel of womanhood—virtue—may be small within her, yet the very vanity of her sex, if nothing else, will compel a certain degree of resistance upon her part before yielding her consent. This is one of the lessons the sexes know by intuition. It requires no 'Locke on the Mind,' or other philosophical teaching, to

tell the average man of this fact. Now, if this be true,—and human experience teaches that it is,—can one say as an absolute, incontrovertible fact, that defendant, viewing her resistance from his standpoint at the time, was led to believe that she was putting forth her utmost resistance to prevent the act of carnal intercourse with her? If he did so believe, and was using the force necessary to overcome any and all resistance that she could make, and at the same time he had the specific intent to have carnal knowledge of her, without her consent, and that she was not consenting, then the case of assault to rape would be complete. If, upon the other hand, her resistance was sufficient to defeat a purpose of his to have carnal intercourse with her, yet her resistance was of such character as to lead him to believe that she would finally yield consent, his specific intent to use the legal force, and to accomplish his purpose at all events, without her consent being wanting (though in fact she would not consent), then he would not be guilty of the higher crime of assault with intent to rape, but of the lower offense of aggravated assault. We claim the evidence will admit this construction, and that resistance, up to the time when she put forth her strength, and freed herself from his embraces, jumped from the buggy and fled, was not of that degree or character sufficient to show either an absolute nonconsent on her part or the necessary specific intent on appellant's part to make a case of an assault with intent to rape. It may be true she was not consenting at any time, and that it was not her purpose to consent, yet, if her resistance was such as not to create in defendant's mind such belief up to the time she jumped from the buggy and fled, it would be unjust to defendant to convict him from this circumstance, and to measure his 'specific intent' alone from her acts, including this last after-act of hers. His acts after the happening of this last after-act of hers may be looked to for the purpose of determining his intent existing before the happening of such act; but certainly it ought not to be taken as an absolute circumstance or presumption of guilt on his part. The law is that, 'when an injury is caused by violence to the person, the intent to injure is presumed, and it rests with the person inflicting the injury to show the accident or innocent intention. The injury intended may be either bodily pain, constraint, a sense of shame, or other disagreeable emotion of the mind.' This presumption extends no further than the law extends it. Therefore, while the assault upon the prosecutrix may be presumed to have been an aggravated assault by reason of the fact that it was made upon her under circumstances which show bodily pain, constraint, a sense of shame, or other disagreeable emotion of the mind, yet, as no other injury was inflicted, no presumption can arise from such injury that any greater or more serious offense was intended. The presumption, then, which the law applies to certain facts, or, more properly speaking, to the effect of certain facts, not being applicable to this case, we must look alone to the facts and the effect of each fact to establish the guilt of defendant; in other words, the specific intent, the quantum

of force required by law on his part, the degree of resistance to measure the consent or nonconsent of the prosecutrix, which last must not be judged of by us in the light of subsequent facts and subsequent surrounding circumstances, but must be judged and determined from the standpoint of defendant, and how it appeared at the time to him; while, upon the other hand, in determining the question of 'specific intent' we may look not only to the degree of force used, age, size, and strength of the parties, but also to the surrounding circumstances. If the resistance be slight, and the force be commensurate only with such resistance, while the prosecutrix is capable of much greater resistance than is used by her, and the party attacking does not accomplish his purpose, then the inference naturally follows that he is wanting in the necessary 'specific intent to rape.' Again, if the prosecutrix makes resistance, and no serious violence is inflicted upon her when it is in his power to inflict such violence, and he does not accomplish his purpose, then also it may follow that he has not the 'specific intent to rape.' Again, if the force is so slight as not to completely restrain her in the power of locomotion while she is resisting, and by the means of slight resistance she is able to free herself from his embraces, and flees, and no effort is made upon his part thereafter to detain her, then also the inference may follow that he was wanting in the 'specific intent to rape' at the time of the assault. These are all facts and circumstances to be determined by a jury, under appropriate instructions; and when the charge of the court is so framed as not to present fairly this issue, or permits the jury to convict upon less force, or, in other words, less evidence, than the law requires to show the 'specific intent,' then such a charge is material error, and is a substantial injury to defendant. It will not do to say that the verdict is supported by the evidence, and therefore the case ought not to be reversed. The verdict may be supported by the evidence under the charge given, yet if the court had fully and correctly instructed the jury as to the full quantum of force or the proper degree of resistance in such cases, the jury may have found a different verdict, a verdict for a lesser offense, or may have found no verdict. The question, therefore, is 'not that the error did not injure the rights of defendant, but was it calculated to injure his rights?' The trial court evidently thought, from hearing the testimony, that the issue of the insufficiency of the force to show the specific intent to rape was in this case, because the learned judge who tried this case, in addition to submittig to the jury the question of assault with intent to rape, also submitted the question of aggravated assault. Therefore, the issue of the 'necessary force' to make out this case being in the case, the jury ought to have been properly instructed, as they ought always to be upon matters material, and which go to make the gravamen of the offense. It is true that great sanctity should be given to a verdict of the jury, but this only applies when the jury has been instructed properly upon material matters, and when their verdicts have responded to both the law and the facts. This rule of

sanctity of verdicts does not apply when the jury has been improperly instructed upon material matters, because their verdicts may be fully supported by the facts, and be in strict accord with the instruction of the court, yet radically wrong in law because of the misstatement or misdirection as to the law.

"We will now look at the facts as they could have been looked at and viewed from defendant's standpoint. The parties are in a buggy, at night, traveling along a large public road, going from the party at Cal Wear's house to the residence of the prosecutrix's father. Other people are traveling the same road. One wagon turned east as the prosecutrix and defendant reached the road running east to Salyer's schoolhouse, and west of Joe Queen's house, while defendant's buggy turned west. After they had traveled this road a short distance, defendant and prosecutrix noticed some one behind them in a buggy. Defendant said: 'I wonder what those people want with us. I suppose they want you.' The prosecutrix replied, 'I guess they do not want me.' The buggy then passed, and went out of hearing. There were other people behind them. The prosecutrix, at the request of defendant, took the lines while he put on his gloves, after which he again took the lines. Before this, however, defendant said, 'I believe I will halloo.' She insisted that he should not. He then asked prosecutrix to kiss him, and she told him she would not do it, and said, 'I am not that kind of girl.' This proposition to halloo and kiss was made before reaching the Salyer schoolhouse and Joe Queen road. Now, going back to the point where the buggy passed them on the Salyer schoolhouse and Queen road, after taking the lines and putting his gloves on, defendant asked prosecutrix if she loved him, to which she replied, 'I love everybody.' He then asked her 'to let him have a piece,' and she said, 'You ought to be ashamed of yourself.' At that time prosecutrix was sitting on defendant's left side. He stopped the horse, threw his right arm around her in front, caught her by the left side with his right hand, got in front of her, between her feet, and pushed her left foot out of the buggy, holding her at the same time pressed against the back of the buggy seat, and, pressing his breast against her, got down on his knees, and ran his left hand up under her clothes and put his bare hand on her privates. He caught her right leg with his left hand, so she says, and, continuing, she says: 'His pants were unbuttoned, but I do not know whether his penis was out of his pants or not. He unbuttoned my drawers, which were buttoned on my right side, and pulled them down in front. He had his right hand around my waist, and had my right leg with his left hand, and was holding me so that I could hardly move. He said I had just as well give up, as he was going to take it anyway. He used great force, and handled me so roughly as to hurt me. While he had me in the position I have described, he raised my clothes, and pulled my body to him, and pushed his body towards me. He did not tear my drawers, but simply unbuttoned them; nor did he tear any of my clothes.' For the present

we will stop here to consider the degree of force used by defendant, as the foregoing facts relate to his acts, and not to the acts of prosecutrix. It can not be denied that the acts of defendant show both the desire and a purpose upon his part to have sexual intercourse with the prosecutrix; but it does not follow, nor do these facts within themselves show a specific intent to rape, because we are looking at them now without reference to the acts of the prosecutrix. So far the question of consent or nonconsent of the prosecutrix does not appear from the above statement. It is true that she does tell defendant in the outset, when the proposition is made to her 'to let him have a piece,' that 'he ought to be ashamed of himself,' (a very proper thing for any girl who knows the meaning of the term 'let me have a piece' to do). She did not do what a great many other virtuous girls probably would have done,—either slapped his jaws, expressed or feigned an ignorance of the meaning of the term,—but by her reply to defendant immediately gave him to understand that she fully knew the meaning of the term, without in the least resenting it. And this fact, together with her conduct may have stimulated his desire to have carnal intercourse with her, and to have led him to believe that all that was required of him was an effort in that direction, and his desires would be accomplished. True, it may not have done so, but it is a fact that can be looked to from different directions. At all events, immediately after this verbal act of hers (bear in mind there was no express positive denial by her at that particular time of his request) he immediately began those physical acts as detailed by the prosecutrix. Now, every act detailed by her may be perfectly true, and yet inconsistent with the theory of a specific intent to commit rape, and consistent with the theory that it was his purpose to have carnal intercourse with her, with her consent, either passive of positive. In looking to the question of intent, we may not only look to the force used, but to the surrounding circumstances, the relative ages, size, and strength of the parties. This occurred upon the public road. True, it was at night, and dark; but other people were behind, coming from the party. Both prosecutrix and defendant knew of this fact, because when they left Cal Wear's such people were preparing to get into their vehicles, and at the time of the alleged assault the prosecutrix and defendant both must have known that the Queen girls, who would travel that road, could not be far behind, as they were about ready to start when defendant and prosecutrix left Cal Wear's house. Not only this, but they (defendant and prosecutrix) were only two or three hundred yards from Joe Queen's house, just ahead of them on the road. It is therefore hardly reasonable to suppose that defendant, under such circumstances, intended to use the necessary violence to rape this girl, when he must have known that by a very slight effort on her part, by an exercise of her lungs, she could instantly bring to her help some one who would frustrate such purpose. Again, they were in a buggy, and no effort was made by defendant, after stopping the horse, to secure him in any

way, but, upon the contrary, according to the girl's testimony, he stopped the horse, and dropped the lines. Common sense would have taught him that if it was his specific intent to rape, and that the girl so believed, a mere cluck from her to the horse would have defeated his purpose by compelling him to desist, for the time being at least, from his intention to the girl, in order to look after and control the horse. Then, again, his manner of unfastening her drawers, and the fact that her clothes were not torn in the least, dispels the idea of force necessary to show a specific intent to rape. He unbuttoned her drawers, pulled them down in front, without so much as the 'ripping of a thread,' or the breaking or tearing of a buttonhole. Now, bear in mind this is, if anything, a question of force vel non, unaccompanied by either fraud or threats. The State does not in any way rely upon threats; in fact, there is no pretense that threats are in or enter into this case.

"Let us now look at the case with reference to the question of resistance, first offering the facts bearing thereupon. 'He unbuttoned my drawers, which were buttoned on my right side, and pulled them down. He did not tear my drawers, but simply unbuttoned them. He had his right hand around my waist, and had my right leg with his left hand, and was holding me so that I could hardly move. I caught hold of his hands, and tried to hold them, and pushed against his breast with my hands with all my strength. I begged him to quit, and let me alone, and tried to shame him. He said that I had just as well give up, as he was going to take it anyway. He used great force, and handled me so roughly as to hurt me. While he had me in the position I have described, he raised my clothes, and pulled my body towards him, and pushed his body towards me. My clothes were not torn, but he unbuttoned my drawers and they were unbuttoned when I jumped out of the buggy. I held them up until just before I went under the fence, when I managed to get them buttoned. When we left Mr. Wear's, there were other parties getting ready to leave, because I saw them putting on their gloves and wraps. Some of them would travel the same road we were on, but I did not know where they were at the time I jumped out of the buggy. I know that some of them were behind us. They had not passed us. I did not halloo when he had his hand on my privates. I told him to quit. While he had me in the position I have described, he raised my clothing, and pulled my body towards him, and pushed his towards me. I resisted him with all my strength, and every way I could, from the time he first took hold of me; but I did not halloo. During the struggle I pushed him back against the dashboard of the buggy, and got loose from him, and jumped out of the buggy. When I jumped out of the buggy, I hallooed twice. I said, "Oh! Oh!" I then ran up the road about fifty yards. The defendant called to me, and I understood him to say that I had just as well come back, as he would catch me before I got home.' However, upon cross-examination she says that defendant did not get out of the buggy and follow her. 'He said something to me from the

buggy, just before I went under the wire fence. I can not say I understood what he did say. He may have asked me to come back; that he would not hurt me. I know he said something about home, but I understood him to say that I had as well come back, as he would catch me before I got home.' In the discussion of these facts, we will separate them into two different periods for the purpose of determining the degree of resistance and its purposes as viewed by defendant from his standpoint: First, as to the resistance before she freed herself from defendant; second, as to the resistance when she freed herself, and jumped from the buggy and fled. Now, as to the first period of the resistance. It is true that the prosecutrix in her testimony says: 'I resisted him with all my strength, and in every way I could, from the time he took hold of me. He used great force, and handled me so roughly as to hurt me.' We assume that this statement of the witness will not weigh with the court as facts, but it will be taken, as it is, as a mere matter of opinion of the witness, as she has detailed the facts going to show the resistance she made. To determine the question of resistance, we will look to the force used by defendant, as well as to the facts going to show the resistance offered by prosecutrix, taking into consideration the surrounding circumstances, as well as the ages of the parties. As there is nothing in this record as to the size or strength of the parties, of course this circumstance, which is a very important one, in estimating both the degree of force and resistance, can not here be considered. Now, bear in mind that the question of the success of her resistance is not the proper criterion for the purpose of determining the guilt of the defendant. Her acts of resistance, however, and the degree of such resistance, may be looked to for the purpose of determining whether or not she consented, or whether defendant was led to believe that she was consenting, or would consent, which, of course, would have a bearing upon the question of force used by him in connection with the degree of resistance offered in arriving at and determining the question of his specific intent. When the proposition was made to her by the defendant, her only resistance was to shame him. There was no emphatic denial of the request. When he stopped the horse, threw down the reins, and threw his right arm around in front of her, and caught her by the left side with his right hand; when he got in front of her, between her feet, and pushed her left foot out of the buggy, at the same time holding her pressed against the back of the buggy,—she made no outcry, though she was but a short distance from Queen's house, and though she knew that the Queen girls and other people were behind, and had every reason to believe that they were not very far off. Nor did she at that time either attempt to leave the buggy, or cluck to the horse, or cause him to move forward, or do anything except make a very feeble resistance against his efforts. When he had pressed his breast against her, and got down on his knees between her feet, ran his left hand up under her clothes, and put his bare hand upon her privates, she made no

outcry, though she must have known at that very time that defendant's pants were unbuttoned, because she could hardly have had any other opportunity in the dark, after that, to have determined that question. Nor did she during that time fully use her hands, as she certainly was capable of doing, because, though defendant had caught her right leg with his left hand, and unbuttoned her drawers, and pulled them down in front, neither the buttonhole of the drawers, nor the drawers, nor any part of her raiment was torn; nor is there any evidence that her leg was in any way bruised or lacerated. There is no evidence of a scratch or bruise on her person resulting from either the force used by defendant or the resistance offered by her. All that she did was to catch hold of his hands, and try to hold them, and push against his breast with all her strength, and shame him, and beg him to quit. She could not have made any very vigorous use of her hands in her effort to hold defendant's hands and prevent the use of them, because just before this assault began she held the horse while defendant put on his gloves, while they were riding along in the buggy together, and the first intimation that she had of the fact that his gloves were off and his hands were bare was when she felt his bare hand on her private parts. The very expression that he used at the time, 'You had just as well give up, as I am going to take it anyway,' discards the idea of any specific intent to rape, but shows, upon the contrary, that defendant did not regard her resistance as being serious. She had allowed him to unbutton her drawers without a break of the buttonhole, to pull them down in front of her without the tear of a thread, to put his naked hands upon her private parts, and to place himself between her feet with his breast against her, without a call for help upon her part, when both she and defendant had strong reason for believing that help was near at hand. These are all circumstances that could have been looked at by defendant as bearing upon the question of her consent, and which tend strongly to negative any specific intent on his part to rape. These are the salient features of this case before the final act, by which she threw defendant from her, jumped from the buggy, and fled. Now, losing sight for the present of this final act, are these acts of resistance of so conclusive a nature that anyone can say with an absolute degree of certainty she was not passively consenting? True, she was resisting to a certain extent, but not to that extent that makes conclusive her want of consent. Resistance is a 'criterion' by which consent is to be tested. If there be no resistance, or the resistance be slight, then a party seeking to have carnal intercourse with a woman may imply consent. If, upon the other hand, the prosecutrix is resisting to the utmost, and defendant knows this, then such resistance, so far from implying consent, negatives it. We suppose that it will be admitted by the court that up to the time prosecutrix pushed defendant over against the dashboard, jumped from the buggy, and fled, that she was not putting forth her utmost efforts and her greatest resistance to free herself of defendant, because she was

not using all the means within her power to do so. When we take into
consideration the surrounding circumstances, her belief and defendant's
belief that other parties were behind them, and not far off, the public
road, and the close proximity of Queen's house, the conclusion is almost
irresistible that one strong, healthy call for help by her would have had
more effect towards convincing defendant of her nonconsent than all of
her passive acts as detailed by her. Do not understand us as saying
that she ever had at any time consented or did not consent; but what
we do say is this: that her resistance at the time, before she pushed de-
fendant against the dashboard, jumped from the buggy, and fled, was
not of that degree or character to convince him, looking at and viewing
it from his standpoint, that she was not consenting, and would not con-
sent, when measured by that rule which the law has provided in such
cases. True, she may have been 'using all the resistance that she should
make,' and it may be true that the jury took this view of it when they
returned their verdict; and it is equally true that the trial court also
must have taken the same view, because the judge so instructed the jury.
But such is not the law; nor was defendant so limited at the time of
her acts by what the law allowed as to his impression to be formed by him
from her acts. It would be manifestly unjust to say that the want of
consent is to be determined from the fact that the woman in resisting
must put forth her utmost efforts, and at the same time, when she does
not resist, or the resistance is so slight as to create the impression upon
the mind of defendant that she is consenting or will consent, that de-
fendant on trial may be tried by any rule which makes no resistance or
slight resistance short of that required by law as the test. A charge
so framed as to permit a conviction under such circumstances would
deprive defendant upon trial of a substantial right, and would, there-
fore, cause him substantial injury. Measured, therefore, from this
standpoint, the errors of commission and omission in the charge of the
lower court are material, and were calculated to injure the rights of
defendant for the reasons given by us. We will now look to the acts
of defendant and prosecutrix at the time when the prosecutrix pushed
defendant against the dashboard, and jumped from the buggy, and fled,
and the occurrences immediately thereafter. We apprehend that it will
be conceded by the court that when this happened all force on the part
of defendant ceased. This act of hers was the first positive affirmative
act tending to convince defendant that she was not consenting and would
not consent to the act of carnal intercourse with him. Up to this time,
from the slight degree of resistance made by her, he may have had
reason to believe that her efforts were the promptings of female vanity,
and not a defense of virtue, and that she would finally consent. We do
not say such was the fact, but, looking at it from his standpoint, he
may have so considered; but, at all events, no such conclusion could
have been reached by him after she pushed him against the dashboard,
jumped from the buggy, cried, 'Oh! oh!' and fled. Any further use

of force on his part, any effort to pursue, or any pursuit would have tended strongly to show the specific intent to rape. This court seems to lay much stress upon this last act of hers, and, we think, correctly, as bearing upon the question of the want of consent; but the court must bear in mind that it is looking at an after-act, which defendant could not have foreseen or considered until it occurred; and therefore we respectfully submit that it might be unjust to defendant to determine from this act of hers that defendant had° the specific intent to rape. After this last act of hers, what act of his is there going to show a specific intent to rape? We answer, 'None.' He made no further effort to restrain her, made no pursuit, and did not in any way attempt the further use of force, but, upon the contrary, drove off in his buggy. This fact of driving off and leaving the young lady on the roadside was certainly very reprehensible in him, but it is certainly no part of an assault with intent to rape. He may have become conscience-stricken, and awakened to the fact that he had acted no part of a gentleman in attempting to have carnal intercourse with a virtuous girl, and may have realized that he had gone too far, or that any effort on his part to persuade her to return to the buggy with him would be useless. Be that as it may, his driving off and leaving her does not make a cause of assault, nor does it in any way tend to show the necessary specific intent to assist in the making of an assault with intent to rape. Upon the contrary, it is strong evidence tending to show that he had no such intent. The prosecutrix says she understood him to say, 'I had as well come back, as he would catch me before I got home. I know he said something about home.' But this part of her testimony is too uncertain to be considered, because upon cross-examination she says, 'I can not say that I understood what he said. He may have asked me to come back; that he would not hurt me.' Now, this amounts to nothing, because he did not make any effort to catch her before she got home; nor did he get out of the buggy to follow her, or use any force of any kind. The prosecutrix says, 'He did not get out of the buggy to follow me.' If he had the specific intent to rape,—that is, to overcome her by force, and to have carnal knowledge of her without her consent, regardless of any and all resistance she could make,—then the question naturally presents itself, why did he not follow her? His purpose could have been much more easily accomplished on the ground than it could have been in the buggy. There upon the ground he could have brought his whole strength into play, and could in all probability have overpowered her, and accomplished his purpose. Yet he did nothing of the kind, and made no effort, even after her flight from the buggy, to the accomplishment of such a purpose. Looking then, at this case in all its different phases, we respectfully submit that the errors of the lower court are material, and that, if the law had been properly given to the jury, the jury might have found a different verdict for a less offense, and therefore the injury is such 'as calculated to injure the rights of defendant.' Upon

the trial of this case, again, the jury, under proper instructions as to the law, will have the size of the parties before them, will learn something of the relative strength of the prosecutrix and appellant, which facts are not before this court, and therefore can not be considered by it in passing upon the guilt or innocence of appellant; while by the jury such facts can be passed upon, and may be considered by them, when they are properly instructed, in estimating the amount of force necessary to be used, as well as to determine the degree or character of resistance to be made. Your honors, if the parties, defendant and prosecutrix, were of equal strength; she a very large girl, and he a very small boy; one about seventeen and the other about nineteen years of age,—it might be a very important circumstance to be considered by the jury in passing upon the question of specific intent. If such circumstances actually existed at the time of the alleged assault, and defendant knew of her age, her size, her strength, and knew that he could not have sexual intercourse with her unless she consented, without the use of great and extreme violence, and he failed to use such violence, it would go far, when the jury are properly instructed, to show a want on his part of the specific intent to rape. It seems to us that, in the absence of these facts, the court is not in a position to say defendant had the specific intent to rape, or prosecutrix offered all resistance in her power to prevent defendant accomplishing a specific purpose to rape, if he had such purpose. At all events, taking into consideration the errors in the charge of the court and the condition of the record as to the facts, this court, we respectfully submit, should reverse this case, in order that the question presented as to the facts may be passed upon by a jury under appropriate instructions."